IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTOPHER ROGERS, by his parents and next friends, Christopher and Flavel Rogers,<br><br>Plaintiffs,<br><br>v.<br><br>HEMPFIELD SCHOOL DISTRICT,<br><br>Defendant. | CIVIL ACTION<br>NO. 17-1464 |

**MEMORANDUM OPINION**

**Schmehl, J.  /s/ JLS**                                                                 **September  27, 2018**

## I.     INTRODUCTION

In this action under the Individuals with Disabilities in Education Act (IDEA), 20 U.S.C. §§1400-1419, Plaintiff Parents argue Defendant School District failed to provide their son Christopher with appropriate transition services and planning, and thus failed to provide him with a Free Appropriate Public Education as required under the law. Parents further claim the service plans under §504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, did not adequately enable their son to access the District's educational program, and that the District discriminated against him in violation of the Americans with Disabilities Act. The administrative hearing officer who previously heard the matter disagreed and denied Parents' request for compensatory education.

Before the Court are the parties' cross-motions for judgment on the administrative record, as well as several responses and replies. For reasons discussed below, the Court agrees with the hearing officer and will grant judgment in favor of the District.

## II.   LEGAL STANDARD

When reviewing administrative decisions under the IDEA, district courts are to employ a "modified *de novo*" standard, giving "due weight" to the hearing officer's factual findings. *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 269-70 (3d Cir. 2003). The court "must make its own findings by a preponderance of the evidence," *Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 430 (3d Cir. 2013), but must also defer to the hearing officer's credibility determinations and should only depart from the hearing officer's factual findings if it can "point to contrary nontestimonial extrinsic evidence on the record." *S.H.*, 336 F.3d at 270. This deference is due at least in part to the administrative expertise in educational issues and the related principle that the court should not "substitute its own notions of sound educational policy for those of local school authorities." *S.H.*, 336 F.3d at 270 (quoting *MM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 531 (4th Cir. 2002)); *see also Jeremy H. by Hunter v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 284 n.23 (3d Cir. 1996) (noting that exhaustion is required in part because of the "specialized expertise of state education officials," including with respect to appropriate IDEA evaluation procedures).

To comply with the IDEA, a student's IEP must be "reasonably calculated to enable the child to receive educational benefits." *Endrew F. ex rel. Joseph F. v. Douglas County School District RE-1*, 137 S. Ct. 988, 996-96 (2017). When an IEP is reasonably calculated to allow a disabled child to receive educational benefits, the child has received a FAPE. Until recently, the Supreme Court had "declined 'to establish any one test for determining the adequacy of educational benefits conferred upon all children covered by

the Act.'" *Id.* at 997 (quoting *Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley*, 458 U.S. 176, 202). The Supreme Court recently clarified this "reasonably calculated" standard in *Endrew F.* where it held: "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999. This last phrase—"appropriate in light of the child's circumstances"—demands a "fact-intensive exercise" informed by the expertise of school officials and the child's parents or guardians. *Id.* The question is ultimately whether the IEP is "reasonable," not whether it is "ideal." *Id.* To this end, the IEP must be "appropriately ambitious," and the progress contemplated must be "appropriate in light of the child's circumstances." *Id.*[1]

The Third Circuit has not ruled on the standard of review that should be applied to fact finding in a Rehabilitation Act or Americans with Disabilities Act case that arises from an IDEA due process hearing. *See Centennial Sch. Dist. v. Phil L. ex rel. Matthew L.*, 799 F. Supp. 2d 473, 481-82 (E.D. Pa. 2011); *A.W. ex rel. H.W. v. Middletown Area Sch. Dist.*, 2015 WL 390864, at *8 (M.D. Pa. Jan. 28, 2015); *M.W. v. Sch. Dist. of Philadelphia*, 2016 WL 3959073, at *2 (E.D. Pa. July 22, 2016). Given that the FAPE-based relief sought here pursuant to Section 504 and the ADA is the same relief sought pursuant to the IDEA, I will apply the same IDEA modified *de novo* standard of review to the IDEA, Section 504 claim, and ADA claims.

---

[1] Plaintiffs claim that *Endrew F.*, decided after the Hearing Officer's decision in this matter, "significantly changed the legal standard" regarding FAPE. This assertion is incorrect, as the Third Circuit just recently found that *Endrew F.* did not overrule Third Circuit precedent, but rather found that "*Endrew F.*'s language parallels that of our precedents." *K.D. v. Downingtown Area School Dist.*, 2018 WL 4441134 (3d Circ. Sept. 18, 2018). Accordingly, the Court found that it is appropriate for a hearing officer to use the "meaningful educational benefit" standard that courts in this district have been using for years. Specifically, the Hearing Officer in this case stated that an IEP must be "reasonably calculated to yield meaningful educational benefit," meaning it affords the opportunity for "significant learning." AR HOD pp. 11-12. Clearly, this standard mirrors the standard set forth in *Endrew F.* and Plaintiffs are incorrect in their assertion.

Because the facts were established at the administrative level, and neither party has sought to supplement the administrative record, there are no genuine issues of material fact. Therefore, judgment on review of the administrative record is an appropriate mechanism to render judgment. *See Ferren C. v. Sch. Dist. of Philadelphia*, 595 F. Supp. 2d 566, 572 (E.D. Pa. 2009), *aff'd*, 612 F.3d 712 (3d Cir. 2010).

### III. FACTUAL BACKGROUND

Christopher Rogers ("Student") was previously a student in the Hempfield School District. Administrative Record (hereinafter "AR"), Hearing Officer Decision (hereinafter "HOD") p.3. Having moved to the District as a sixth grader, he was identified as eligible for special education services as a student with autism. *Id*. From ninth through twelfth grades, Student attended Hempfield High School, his neighborhood school. AR, Exh S-1, p.1. In addition to standard academic coursework, Student took courses relevant to transition skills including consumer math, family consumer science, communication technology, fitness for life, and the preschool child. AR Exh S-1 p.1; N.T. 105-106. Throughout all four years of high school, Student worked toward a transition-related graduation project through a computerized system called Naviance. *Id;* AR N.T. 103. This entailed conducting a career interest survey, participating in career day, resume writing, and then exploring potential postsecondary options including trade school and community college. AR N.T. 106; Exh S-3 p.20. In addition, Student received job coaching and vocational and transitional experiences under the supervision of a job coach. AR S-3 p.16, N.T. 108-112. This job training included vocational experiences in a grocery store, at a small business, at the local library, and through an in-house small business activity via the District's print-shop. AR N.T. 108-110, Exh S-3 p.16. The job

trainer also completed lessons with the Student including lessons on writing his signature, first impressions with employers, and internet safety. AR N.T. 111-112; S-3 p.16.

By spring of Student's junior year, he was having anxiety about life beyond high school, and was concerned about reconciling his desires with those of the people around him. AR HOD p.4, Finding of Fact (hereinafter "FF") 6. Accordingly, Student's IEP team decided that he should attend the Mount Joy career and technical school to participate in the half-day culinary cluster. AR Exh S-3 p.23. The half-day cluster program is designed to expose students to a variety of jobs within the food service industry. AR N.T. 114-115. Exposure to multiple jobs was important to the team because Student was unsure of what he was looking for in future employment. AR Exh S-3 p.23; N.T. 67. The Mount Joy program is designed to provide specific skills and work habits, while exposing students to a variety of potential careers. AR N.T. 75. Student was provided with special education supports at Mount Joy by an itinerant special education teacher and paraprofessional. AR N.T. 116. Student did not graduate at the end of this 12th grade year (2013-2014), although he had the requisite credits to graduate. AR N.T. 120; Exh S-1 p.1. Instead, Student remained enrolled in the District for further secondary education devoted solely to transition-related activities and skills. The IEP team, including the Parents and Student, decided that Student would participate in the School to Work program through the Lancaster-Lebanon Intermediate Unit 13. AR Exh S-6 p.3; S7. This program is a full time educational program that combines vocational training with independent living training. AR N.T. 125. Through the School to Work program during his 13th year of school, Student had vocational training through experiential learning including job training, job shadows, and work experience at least six times per quarter. AR N.T. 444. These

included experiences in health care, child care, theater, packaging goods, animal care, retail, and laundry. AR N.T. 445-455. He received instruction in job-related tasks such as mock interviews, work behavior, using public transportation, writing a resume, and finding employment opportunities. AR S-6 p.12. Student also received instruction in independent living skills including preparing meals, doing laundry, budgeting, banking, and social skills. AR Exh S-6 p.13; N.T. 125.

The School to Work program is individualized to the unique needs of the students in the program. AR N.T. 470-471. This includes working individually with a job trainer, who then works independently with students to identify fields of interest and to secure employment or training opportunities in those fields. AR N.T. 471-472. The job trainer identified an area of interest in the field of theater for Student, then secured a job shadow opportunity for him at the Fulton Opera House. AR N.T. 446.

In February of Student's 13th year (2014-2015), the IEP team revised the IEP to further explore Student's desire for post-secondary study. The IEP was revised to supplement the School to Work program with the Promoting Academic Success ("PAS") program at Harrisburg Area Community College. AR Exhs S-6 p.11, S-8 p.7, N.T. 474. The PAS program is an eight week program for students to experience a college setting, and to focus on post-secondary skills including time management, study skills, and organization. AR N.T. 385-386. For Student, that experience was an important step is determining his post-secondary path. AR N.T. 386. In the Spring of 2015, the District was made aware that the Student was pursuing admission applications to a post-secondary certificate program at Millersville University. AR HOD p.8, FF 38.

At the end of Student's 13th year, the IEP team was again convened. At that IEP meeting, the Parents declared that Student would be attending the post-secondary program at Millersville University for the 2015-2016 school year. But the Student had not taken a diploma, nor was the District recommending that he be exited from special education due to the fact that Student had not yet met his goals in the areas of banking and anxiety management. AR HOD p.9, FF 42, N.T. 395; Exh S-12 p.13. Therefore, the District issued an IEP recommending that the Student receive instruction and support at Millersville University from District personnel on a dual enrollment basis. The IEP proposed direct instruction in banking and anxiety management, delivered by District personnel on the Millersville University campus. AR HOD p.10, FF 50, Exhibit S-12 p.19. The Parents rejected this proposal and sought school district funding for Student's postsecondary instruction at Millersville University. The District declined to follow through with the parents request by issuing a NOREP, then the Parents sought mediation. AR Exh S-13 p.3.

The Student enrolled in the Career and Life Studies program at Millersville University for the 2015-2016 school year. The Career and Life Studies program is a four semester program for students with an intellectual disability "who are interested in participating in an academic, vocational, and social university experience." AR HOD p.10, FF 51. Even though Student was not identified with an intellectual disability, he was accepted into the program. AR HOD p.10, FF 52. The program consists of audited classes of regular university coursework, while supported by student mentors. AR N.T. 303. District personnel coordinated with Student to provide the dual enrollment services in Student's IEP on Millersville's campus during the 2015- 2016 school year. AR HOD

p.10 FF 55. Parents and Student frequently cancelled sessions; the Hearing Officer found that Student was fully immersed in university life and had moved on from the District. AR HOD pp.10-11, FF 55.

The Student had no difficulty transitioning to the post-secondary program at Millersville University. He quickly gained friends and transitioned to auditing college classes. AR N.T. 555; P-1 p.3. He even lived in a dorm on campus. AR N.T. 554. On his second day on campus, Student was able to locate employment, contact the employer, participate in an interview, and secure the employment all without intervening guidance. AR N.T. 178-179, 555; P-1 pp. 6-7, 16. Student advocated for himself at Millersville, and would approach professors about the supports and accommodations he needed. AR Exhibit P-1 p.11. He has done the lighting for several local theater shows and has secured employment as a paid stage manager with the University's theater downtown. AR N.T. 178. The Hearing Officer found that the Student's transition planning by the District came together "cohesively and powerfully," and that, as a result, the "student has flourished" at Millersville. AR HOD p.14.

At the conclusion of the 2015-2016 school year, the District attempted to schedule an IEP meeting to review Student's progress and to issue a final report on academic and functional performance. Parents and Student did not attend the meeting. AR HOD p.11, FF 56. The District then issued a NOREP for the issuance of a diploma from the District, as the Student had turned 21 and had aged out of secondary school. AR HOD p.11, FF 56, 57. In July 2016, Parents filed their due process complaint which led to these proceedings. AR HOD p.11, FF 58. Student continued to attend the Millersville University program for the 2016-2017 school year.

## IV.   DISCUSSION

### A. STUDENT WAS NOT DENIED A FAPE

Plaintiffs in this case argue that the Hearing Officer committed legal error because: 1) the District's programs were not designed to enable Student to make progress; 2) the District's programs were not based on Student's circumstances; 3) the District's programs did not meet Student's unique needs; 4) Student's program was not appropriately ambitious; and 5) the District denied Student appropriate transition services. For the reasons set forth above, I find that the Hearing Officer did not commit legal error in this matter.

#### 1.   The 2014 and 2015 IEPs Provided Student a FAPE

First, as to Plaintiffs' arguments that the hearing officer committed legal error in his decisions regarding the design of Student's program, I find that those arguments are not supported by the administrative record. The Hearing Officer found that the School to Work program that the Student attended "provides students with individualized instruction and experiences based on their skills, needs and interests." AR HOD p. 7, FF 32. This finding is supported by the record. AR N.T. 462, 470-72. The 2014 IEP identified four transition-related needs that Student's programming would focus upon: 1) increase functional living skills to include daily living as well as functional math skills; 2) increase receptive and expressive language skills; 3) self-advocacy, and 4) increase coping skills. AR Exh. S-6 p. 10. In line with those needs, Student's study at the School to Work program included functional learning such as banking and budgeting, reading public transportation schedules, reading the classified section, writing employment

applications and completing a resume. AR Exh. S-9 p. 2. The IEP included instruction in social skills to focus on communication skills including self-advocacy and receptive and expressive language. The Hearing Officer was correct when he determined that the District's programming was calculated to provide Student with a meaningful educational benefit.

Plaintiffs also claim that Student had a "deep and abiding" love of theater, but that his transition plan never addressed those needs at all. However, the record before me clearly shows a student who was undecided as to whether to attend community college or to obtain employment, and also as to what fields he would be interested in studying or working in. AR HOD p. 6, FF 20. At the time of his June 2014 IEP meeting, Student indicated that he wanted to be a tour guide. Student's IEP planned for him to investigate both post-secondary educational institutions and various work-related experiences. AR HOD p. 6, FF 23, 25. Through this investigation as outlined in his IEP, Student was able to job shadow at a local theater. AR N.T. 446. Then, as that year continued, Student's IEP was modified to include the Promoting Academic Success program to allow him to further investigate post-secondary education. AR HOD p. 8, FF 37. Clearly, the District designed programs for Student that allowed him to explore both higher education and post-graduation employment.

Accordingly, as to the 2014 and 2015 IEPs, Plaintiff has failed to identify any errors of fact or law committed by the Hearing Officer. He correctly determined that Student received a FAPE from District for those years.

## 2. 2014 and 2015 IEPs Contained Appropriate Transition Services

The IDEA requires every IEP created for a child aged 16 or older to include appropriate measurable post-secondary goals based on age-appropriate transition assessments related to training, education, employment, and independent living skills, as well as corresponding transition services. 20 U.S.C. § 1414(d)(1)(A) (VIII); 34 C.F.R. § 200.320(b). A transition plan is a "set of activities" based on the student's needs and is created to help the disabled student move from school to post-school activities. 20 U.S.C. § 1401(34)(B); 34 C.F.R. § 300.43. The Third Circuit has not defined what amount of transition planning is required in an IEP to ensure FAPE. *High v. Exeter Twp. Sch. Dist.*, 2010 WL 363832, at *6 (E.D. Pa. Feb. 1, 2010). "While a school district must provide opportunities for a disabled student to build independent living skills and explore a post-secondary educational or vocational plan, courts in the Third Circuit have emphasized that these requirements are undemanding and are focused more on exposure to opportunities than a promise of a particular outcome. *Coleman v. Pottstown Sch. Dist.*, 983 F. Supp. 2d 543, 574 (E.D. Pa. 2013), *aff'd in part,* 581 F. App'x 141 (3d Cir. 2014), citing *K.C. ex rel Her Parents v. Nazareth Area Sch. Dist.,* 806 F.Supp.2d 806, 822 (E.D. Pa. 2011).

The IEPs that the School District developed in June of 2014 and June of 2015 reflect that Student's vocational interests were considered and the appropriate vocational services were provided. The June 2014 IEP includes a post-secondary education and training goal, an employment goal and a discussion of independent living. AR Exh. S-6, pp. 11-12. The IEP stated that Student "may attend community college post-graduation," was "unsure of . . . how he would like to be employed in the future," that "[h]e changes

his mind and is influenced easily, and that "[a]t his May IEP meeting he stated he would like to be a tour guide." *Id.* His mom also stated that Student would live at home after graduation. *Id.* These goals are measurable, with defined goals for employment and education, but also reflect Student's indecision regarding his post-secondary goals.

The June 2014 IEP also included transition activities for education, including research into post-secondary institutions and their admissions processes, information on college fairs, and weekly social skills instruction. AR Exh. S-6, p. 11. Further, the IEP was revised in February of 2015 to allow Student to participate in the Promoting Academic Success program through Harrisburg Area Community College that allowed students to try out a college experience if they were uncertain about their future goals. AR Exh. S-8, pp. 7, 18. For employment transition, the IEP included multiple services and activities regarding work-related experiences, academic instruction, resume creation and social skill instruction. AR Exh. S-6, pp. 11-12. As for independent living, the IEP included services to allow Student to access community resources and agencies and receive instruction in banking/budgeting, organization and self-care. AR Exh. S-6 pp. 12-13.

All of these services contained in the June 2014 IEP were delivered through the IU's School to Work program, a full-time educational program that combines vocational training with independent living training. AR N.T. 125. Through this program, Student was exposed to job training, job shadowing, work experience, mock interviews, workplace behavior, and resume writing, among other things. AR Exh. S-6 p. 12, N.T. 444. He also received instruction regarding preparing meals, doing laundry, budgeting, banking and social skills. AR Exh. S-6, p. 13, N.T. 125.

The transition assessments prepared for the 2014 and 2015 IEPs showed that Student had made significant progress regarding mastery of transition skills during the 2014-2015 school year. *Compare* AR Exh. S-6 pp. 8-19 to S-12 pp. 10-12. Despite the fact that Student had not yet received his diploma, nor been exited from special education, his parents decided that he was going to attend a post-secondary program at Millersville University for the 2015-2016 school year. In order to permit Student to exit special education at the School, the district proposed an IEP where Student remained dually enrolled in the District to receive transition instruction in banking skills and coping strategies, while also attending the post-secondary program at Millersville. AR HOD p. 14, Exh. S-12 pp. 13, 21.

As with the 2014 IEP, this 2015 IEP contained measureable transition goals in post-secondary education (attend Millersville) and independent living (live on campus). AR Exh. S-12 pp. 13-14. As for an employment goal, the IEP notes an interest in theater and caring for the elderly, but that Student was pursuing post-secondary instruction instead of employment. AR Exh. S-12 pp. 11, 14.

The Hearing Officer concluded that the transition programming in the June 2014 IEP, the February 2015 IEP and the June 2015 IEP were all reasonably calculated to yield meaningful educational benefit, and were implemented appropriately. He found that the District :

> Appropriately and effectively planned for and provided a coordinated set of activities for the student, designed within a results-oriented process that was focused on improving academic and functional achievement of the student to facilitate the student's movement from District-based to post-District activities, all based on the student's individual needs.

AR HOD p. 15. Upon review of the administrative record, I agree with the Hearing Officer. There is sufficient evidence of transition activities contained in the administrative record to show that the District provided Student with a transition plan. The Hearing Officer's decision is fully supported by the record and utilizes the correct legal standards. Therefore, I will affirm the Hearing Officer's decision.

### B. THE DISTRICT DID NOT DISCRIMINATE AGAINST STUDENT UNDER SECTION 504 OF THE REHAB ACT OR THE ADA

Lastly, Plaintiffs' Complaint contains claims for violation of section 504 of the Rehabilitation Act ("RA") and discrimination under the Americans with Disabilities Act ("ADA"); however, Plaintiffs make no argument on those issues in their dispositive motion and I consider them abandoned. However, even if Plaintiffs continued to pursue these claims, I find that the Hearing Officer properly dismissed them.

To make out a claim under either the ADA or the RA, the plaintiff must show: 1) a disability; 2) plaintiff was otherwise qualified to participate in a school program; and 3) plaintiff was denied the benefits of the program or was otherwise subjected to discrimination because of his or her disability. *Chambers v. School Dist. of Phila.*, 587 F.3d 176, 189 (3d Cir. 2009). In this matter, Plaintiffs have presented no evidence that Student was denied the benefits of or subject to discrimination from the District. Further, the IDEA, Section 504 of the RA and the ADA are nearly identical, and since I have already determined that there was no IDEA violation, there can be no relief under the RA or the ADA.

### V.     CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Judgment on the

Administrative Record is denied, Defendant's Motion for Judgment on the Administrative Record is granted, and this matter is dismissed. An appropriate order follows.